## PRODUCERS CREAMERY CO. v. ST. LOUIS–SAN FRANCISCO RY. CO. et al.

### No. 778.

United States District Court
W. D. Missouri, S. D.

Dec. 9, 1949.

See also 81 F.Supp. 208.

Miller & Fairman, Springfield, Mo., for plaintiff.

Mann, Mann, Walter & Powell, Springfield, Mo., for defendants.

DUNCAN, District Judge.

This is an action to recover the sum of $4,731.56 for the loss of sweet cream and condensed milk consigned by the plaintiff to a purchaser in New Orleans, Louisiana, which was destroyed at Amite, Louisiana, by milk producers during a strike in the New Orleans milk shed.

The action was originally brought against the St. Louis-San Francisco Railway Company, the initial carrier; later the Illinois Central Railroad Company, the connecting carrier was made a party. The action was brought under the provisions of

Section 20(11) Title 49 U.S.C.A. (Interstate Commerce Act).

The case is before the court on a stipulation and depositions of witnesses taken at Amite, Louisiana, and introduced in evidence. The "Stipulation As to Facts" is as follows (Caption omitted):

"It is stipulated and agreed between the parties hereto that this case shall be tried before the court without a jury upon the pleadings and with the testimony limited to such of the depositions heretofore taken in this case as either party may desire to introduce, and upon the following agreed statement of facts, each party reserving the right to make objections on the ground of competency or relevancy of any fact so stipulated, and to any question or answer appearing in the depositions so introduced in evidence. Any objection to lack of signature of witnesses to depositions or manner and form in which depositions were taken are waived.

" 'Exhibit A' to the Answer of each defendant is a true copy of the Bill of Lading issued by defendant, St. Louis-San Francisco Railway Company, to plaintiff at time shipment in question was accepted by such defendant for transportation to New Orleans. The shipment was routed over the railway line of such defendant from Cabool, Missouri to Memphis, Tennessee, and from Memphis, Tennessee to destination over the railway line of the defendant, Illinois Central Railroad Company. The Bill of Lading was issued at 12:05 o'clock A.M., March 25, 1947.

"The shipment was to go by baggage car and was loaded in Car SF 494, a baggage car. The shipment was picked up by Train No. 135 of defendant, St. Louis-San Francisco Railway Company, at Cabool, Missouri at 12:21 o'clock A.M., March 25, 1947, and arrived at Memphis, Tennessee at 4:40 P.M. o'clock on March 25, 1947, and was delivered to the defendant, Illinois Central Railroad Company, at 5:00 o'clock P.M. at Memphis, on March 25, 1947.

"Car SF 494 containing the shipment in question left Memphis, Tennessee in Train No. One of the defendant, Illinois Central Railroad Company, a passenger train, at 11:15 P.M. on March 25, 1947. Train No. One of the defendant, Illinois Central Railroad Company, arrived in Canton, Mississippi at 3:40 o'clock A.M., March 26, 1947. The train crew on such train was changed at Canton, Mississippi, and the train departed from Canton, Mississippi at 3:45 o'clock A.M., March 26, 1947. Train No. One carrying Car SF 494 arrived in Jackson, Mississippi at 4:25 o'clock A.M., March 26, 1947. Train No. One of defendant, Illinois Central Railroad Company, in addition to carrying Car SF 494, loaded with the shipment in question, and other cars, had in it baggage and express cars IC 821 and IC 605; these last two cars were switched out of Train No. One of the defendant, Illinois Central Railroad Company, at Jackson, Mississippi. The train left Jackson, Mississippi still carrying Car SF 494, containing the shipment in question at 4:35 o'clock A.M., March 26, 1947. Train No. One so carrying Car SF 494 arrived at McComb, Mississippi at 6:15 o'clock A.M., on March 26, 1947, and departed 5 minutes later. Jackson, Mississippi is 114.4 miles, by the defendant's railway line, north of Amite, Louisiana; and McComb, Mississippi is 36.6 miles north of Amite, Louisiana. Defendant, Illinois Central Railroad Company, has facilities for switching cars into and out of passenger trains at both Jackson, Mississippi and McComb, Mississippi.

"The office of the defendant's, Illinois Central Railroad Company, train dispatcher having control of movement of trains, and cars in trains, between from Memphis, Tennessee to New Orleans, Louisiana is located at McComb, Mississippi, and such office has direct telegraph and telephone connections with the office of the Agent of such defendant at Amite, Louisiana.

"The office of the Train Master for the Division of the railroad of the defendant, Illinois Central Railroad Company, from Jackson, Mississippi to New Orleans, Louisiana, is located at McComb, Mississippi, and such office has direct telephone and telegraph connections with the station of such defendant at Amite, Louisiana. The office of the Division's Superintendent having charge of the Division of the de-

fendant's Illinois Central Railroad Company, railroad from Memphis, Tennessee to New Orleans, Louisiana, is located at McComb, Mississippi, and such office has direct telephone and telegraph communications with all points of the defendant's Illinois Central Railroad Company, line of railroad from Memphis, Tennessee to New Orleans, Louisiana and with the general offices of said defendant.

"Train No. One of the defendant, Illinois Central Railroad Company, arrived at Amite, Louisiana at 7:10 A.M. on March 26, 1947. Amite, Louisiana is a 'flag stop' for Train No. One of the defendant for passengers purchasing tickets to New Orleans and to discharge pullman passengers from Memphis. A large crowd of persons had started gathering at, about and near the station of the defendant, Illinois Central Railroad Company, at Amite, Louisiana at 5:00 o'clock A.M. on March 26, 1947; by 6:00 o'clock A.M. there were around 200 people gathered about the station. Between 6:00 A.M. and when Train No. One arrived at Amite, Louisiana, twelve tickets were sold to New Orleans, Louisiana, and the operator on duty flagged Train No. One to stop at Amite, Louisiana to take on the twelve passengers for whom tickets had been sold for said train, and the same did stop there at 7:10 A.M. Before that time the crowd had grown much larger. Some 75 to 100 milk strikers gathered around the train when it stopped, and two unidentified men got on the engine and others talked to the conductor and demanded that they set Car SF 494 on a side track. The train crew then set Car SF 494, containing the shipment in question, on a siding at the defendant's, Illinois Central Railroad Company, station at Amite, Louisiana. Unidentified men, presumably milk strikers, or their sympathizers, then broke the seals upon such car and hauled away or dumped the entire shipment in question, taking away or destroying also the cream and milk can containers. Other unidentified men went into baggage car upon the train and unloaded other milk products. Train No. One proceeded after a 36 minute delay after setting out Car SF 494.

"Plaintiff's merchandise as shipped in said Car SF 494 having been so destroyed by said strikers at Amite was never delivered to the consignee at New Orleans, nor recovered by plaintiff.

"Amite, Louisiana, is 68.7 miles north of New Orleans and is in the area of milk producers, producing and selling milk in New Orleans, Louisiana.

"On the evening of March 24, 1947, the milk producers in the area producing milk for sale in New Orleans, Amite, Louisiana, being in such area, called and announced a milk strike, which would become effective at 7:00 A.M. March 25, 1947, and announced and gave prominence in the news and newspapers published March 25, 1947 in New Orleans, Louisiana, and other newspapers, in the area, that the strike would become effective at 7:00 A.M. March 25, 1947, and that they would not permit any milk or milk products to be hauled or transported into New Orleans on and after 7:00 A.M. March 25, 1947, until the strike was settled.

"The defendant, Illinois Central Railroad Company, operates a train known as their Train No. Three from Memphis, Tennessee to New Orleans, Louisiana. This train passes Amite, Louisiana at approximately 5:30 P.M. Such train arrived at Amite, Louisiana on March 25, 1947 at 5:37 P.M. Among other cars, such train had in it as a part of the train a tank car, known and designated as BCRX 702, loaded with 3,950 gallons of milk, shipped by Brook Haven Creamery Company of Wesson, Mississippi consigned to Cloverland Dairy Products Company of New Orleans, Louisiana. When this train stopped at Amite Louisiana, there was a crowd of approximately 300 people gathered about the station at Amite, Louisiana. When Train No. Three stopped at Amite, Louisiana at 5:37 P.M., March 25, 1947, six or seven unidentified men boarded the engine and informed the engineer that the train was not to leave Amite, Louisiana until all milk in the train was set out or removed, and the same demands were made to the conductor. They demanded that said Car BCRX 702 be placed on a side track. The train crew act-

ing upon these demands set out Car BCRX 702 on a sidetrack at the station of the defendant, Illinois Central Railroad Company, at Amite, Louisiana, and then the train departed. After the car BCRX 702 was 'set out, unknown persons opened the car and the drain valve on the car and allowed the milk to drain out of the car. While the train was stopped at Amite, Louisiana, 12 to 15 unidentified men boarded a baggage car on the train and removed forty 10-gallon cans of milk shipped from Brook Haven, Mississippi to New Orleans, Louisiana. The train contained Car IC 5754 loaded with mail going to New Orleans, Louisiana, which was sealed. Persons in the crowd broke the seal on this car and opened the car door, but then closed same and resealed it with new seals obtained from the operator on duty at defendant's station after seeing it was loaded with mail and that it carried no milk.

"Operator J. M. Allen, employee of defendant, Illinois Central Railroad Company, operator on duty at Amite, Louisiana at the time Train No. Three stopped there and milk was unloaded from the baggage car and the milk car was set out and drained, telephoned such information to the Chief Dispatcher of the Division at McComb, Mississippi, before 8:30 P.M. on March 25, 1947.

"Between 10:30 P.M. and midnight on March 25, 1947, unknown persons shot holes in Tank Car BCRX 702, which had been set out at the station at Amite, Louisiana. An agent or operator, employed by defendant, Illinois Central Railroad Company, is on duty and in charge of the station at Amite, Louisiana 24 hours a day.

"The milk strike above referred to was settled on the evening of April 3, 1947.

"The attached time table marked Exhibit D of the Illinois Central Railroad Company is the time table which was in effect on March 25, and 26, 1947.

"The attached copy of telegram, marked 'Exhibit A', is a true copy of a telegram sent by Mr. Casey, Superintendent of the division of the defendant, Illinois Central Railroad Company, dated March 25, 1947, was dispatched by the telegraph operator at

McComb, Mississippi at 4:18 o'clock A.M. on March 26, 1947. The copy of the telegram attached hereto, marked 'Exhibit B', is a true copy of a telegram sent by Mr. Casey on March 26, 1947; said telegram having been dispatched at 1:25 o'clock P.M. These telegrams were sent to the following persons, holding the following positions with the Illinois Central Railroad Company, among others, to-wit:

"Mr. S. F. Lynch-General Manager

"Mr. C. M. Chumley-Engineer Maintenance of Way

"Mr. G. J. Willingham-Manager of Personnel

"There are other lines of railroad running from Memphis, Tennessee to New Orleans, Louisiana other than that of the defendant, Illinois Central Railroad Company. Railroad cars and railroad shipments can be routed from Jackson, Mississippi to New Orleans, Louisiana over railroad lines, and also from McComb, Mississippi over railroad lines, including from Jackson, Mississippi a line of the defendant, Illinois Central Railroad Company, without being routed through Amite, Louisiana.

"During the course of the strike the strikers at various points in the area stopped, took possession of and destroyed various shipments of milk moving into New Orleans by truck.

"Shortly following the strike eleven (11) persons were indicted for various offenses in connection with the interference with Train No. Three of the defendant, Illinois Central Railroad Company, at Amite, Louisiana, on March 25, 1947. In one count they were charged with a conspiracy to violate the anti-racketeering act, Section 420, Title 18 United States Code Annotated [see revised 28 U.S.C.A. § 1951], and received sentences, in some cases for six months, others for one year, and one with a sentence of six months and a $500.00 fine. In other counts of the indictment the same persons were charged with wilfully and knowingly obstructing the passage of the mail in violation of Section 324, Title 18, United States Code Annotated [see revised 28 U.S.C.A. § 1701], and with theft from an interstate shipment, in violation of

Section 409, Title 18, United States Code Annotated [see revised 28 U.S.C.A. § 659]. As to the latter counts these persons pleaded guilty and received suspended sentences, being placed on probation for five years.

"Fourteen (14) persons were indicted for interference with the movement of passenger Train No. One, of the defendant, Illinois Central Railroad Company at Amite, Louisiana, on March 26, 1947. They were indicted under one count for conspiracy to violate the anti-racketeering act, Section 420, Title 18, United States Code Annotated. Two were acquitted, the remaining twelve received sentences, one for one year with $1,000.00 fine, one for six months and a $500.00 fine, others for either one year or six months. Under the other counts of the indictment, the same persons were indicted for violation of Section 324, Title 18, United States Code Annotated, and Section 409, Title 18, United States Code Annotated, and on these two counts two were acquitted, the remaining twelve pleaded guilty and received suspended sentences and were placed on probation for five years.

"Exhibit C hereto attached is a duly certified copy of the tariffs application to the shipment in question, on file with and approved by the Interstate Commerce Commission and in force at the time of the shipment in question.

"In the event the court finds the issues in favor of plaintiff and against either of the defendants, it is agreed that the measure of its damage and the amount for which it would, in that event, be entitled to judgment is $4,731.56, reserving however, to the defendant, St. Louis-San Francisco Railway Company all rights granted to it as the originating carrier under Section 20, Paragraph 12, Title 49, United States Code Annotated.

"Dated this 13th day of June, 1949." (Signatures Omitted.)

"Mo RD
    McComb March 25 1947
All Concerned
            Chicago Ill
537 P March 25 Amite La No 3 Eng 2426 15 Cars Condr Crisler Engr Cotten was Meet By Approximately 300 People 6 Or Seven Unidentified Men Boarded Engine And Informed Engr No 3 Was Not To Leave Amite Until All Milk In Their Train Was Set Out Or Removed Same Demands Made To Condr. BCRX· 702 Loaded With 3950 Gallons Milk Shipped By Brookhaven Creamery Co Wesson Miss Consigned To Cloverland Dairy Products Company New Orleans Was Set Out, After Car Set Out Unknown Persons Opened Car And Drain Valves Were Opened Allowing Milk To Drain From Car. Approximately 12 To 15 Unidentified Men Boarded Baggage Car And Removed 40-10 Gallon Cans of Milk Shipped by Brookhaven Creamery Company Brookhaven Miss Consigned To Cloverland Dairy Products Company New Orleans This Milk Hauled Away In Trucks. IC 5754 Overseas Mail In Train For New Orleans Seal Was Broken On Side Of Car, Unidentified Party Requested Operator On Duty Amite For Seal To Reseal Car This Car Arrived New Orleans Bearing Seals RMG-629570 and IC 985267. NRC 240 Loaded Chicago Illinois March 24th With 250-10 Gallon Cans Milk Shipped By Broden Co Consigned to Southern Dairy Producrs Company New Orleans Arrived New Orleans With One Seal Missing Contents Of This Car Not Disturbed. No. 3 Delayed 29 Mins. Milk Shippers In This Area Are On Strike. Joint Lynch Chumley And Willingham On Line

                Casey

"(Exhibit 'A')
"Mo G McComb · Mar 26Th    47
all Concerned Chgo
710 A M Date No 1 Eng 2445, 17 Cars Condr. Ward· Engr. Caulfield Arrived Amite Where They Stopped To Pick Up New Orleans, A Crowd Of 75 To 100 Milk Strikers Gathered Around Train, Two Of Them Getting On Engine And Demanding Engr. Caulfield To Get Off Engine And Go Get Conductor Then Demanded That They Set Out SF 494 Containing 350 10 Gallon Cans Milk From Cabool Missouri Billed Brown Velvet Ice Cream Company New Orleans Set Out And Later Contents Hauled Off In Trucks. Also These Men Went In Baggage Car And Unloaded 20 Cans Cream 15 Cans Cond. Milk. Ship-

ment In Baggage Car Consigned Superior Cream Co New Orleans. No. 1 Delayed 36 Mins. During The Night Unknown Persons Fired Several Shots Into Both Tanks Of BCRX 702 That Had Been Set Out Of No. 3 Doing Considerable Damage To Tanks. 910 A M Raiford Conerly Of Amite Representing Dairymen Union Came To Depot And Requested Agent Call Train Master Massey Demanding That We Stop All Southward Trains Including Panama Limited At Amite And Have Conductor Present Waybills To Them So They Could Check The Waybills To See If Any Milk In Their Train And That If We Did Not Do This They Would Delay Every Train By Stopping Them And Inspecting Train. Trainmaster Refused To Do This.

Casey

Copy On Line To S F Lynch And C M Chumley."
"Exhibit 'B')."

The complaint is in two counts. The first count is based upon the defendants' common law liability to safely deliver the consignment. The second count is based upon negligence of the defendants "in failing and neglecting to protect and guard plaintiff's property from and against the depredations of other persons to save same harmless from being destroyed and lost." The plaintiff is proceeding upon the second count of its complaint.

The plaintiff contends that defendants had knowledge of the existence of the strike and the violence resulting therefrom for a sufficient period of time prior to the destruction of its property, either to have re-routed the car, cut it out of the train, or taken other precautions for its protection.

In its answer the defendants admit destruction of the property as a result of the strike and rely upon the provisions of their bill of lading and the tariff regulations which relieved the carriers from liability for loss resulting from "riots or strikes." The provisions of the regulations are as follows:

"Section 4(b) Train Service—The carriers reserve the right to restrict shipments covered by this tariff to trains designated by them.

\*     \*     \*     \*     \*     \*

"(j) Responsibility—The carrier does not undertake to overcome the inherent tendency of the commodities handled under authority of this tariff to spoil, and in the absence of negligence by the carrier, it shall not be liable for loss or damage that may result from spoilage. The carrier shall not be liable for any loss thereof, for damage thereto, or delay caused by the act of God, the public enemy, the authority of law, or the act or default of the shipper or owner, or for natural shrinkage. *Except in case of negligence of the carrier, the carrier shall not be liable for loss, damage, or delay resulting from a defect or vice in the property, or from riots or strikes.*" (Emphasis supplied.)

The provisions of the uniform bill of lading follow very closely the tariff regulations and are as follows:

"Received, subject to the classifications and tariffs in effect on the date of the receipt by the carrier of the property described in the Original Bill of Lading, at Cabool, Mo., March 25, 1947, from Producers Creamery Co. the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination.

"It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on back hereof, which are hereby agreed to by the

shipper and accepted for himself and his assigns.

\* \* \* \* \* \*

"Sec. 1(a). The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto except as hereinafter provided.

"(b) No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the authority of law, or the act or default of the shipper or owner, or for natural shrinkage. The carrier's liability shall be that of warehouseman, only, for loss, damage, or delay caused by fire occurring after the expiration of the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided) after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination, or tender of delivery of the property to the party entitled to receive it, has been made. Except in case of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage, or delay occurring while the property is stopped and held in transit upon the request of the shipper, owner, or party entitled to make such request, or resulting from a defect or vice in the property, or for country damage to cotton, or from riots or strikes."

The defendants further allege that the loss of the milk and cream resulted from no fault or negligence on their part, and was caused solely as a result of a strike. There is no serious dispute as to the facts or the law.

The strike was called for 7:00 o'clock on the morning of March 25. There is no evidence and no statement in the stipulation that the plaintiff had any knowledge of the existence of the strike when the delivery was made to the initial carrier at 12:21 o'clock on the morning of March 25—6½ hours before the strike was to begin. For that reason, I find no fact to sustain defendants' contention that the plaintiff was guilty of contributory negligence in delivering the milk and cream to the initial carrier.

Therefore, the sole question for determination is whether or not the defendants were guilty of negligence. If the property was destroyed solely as a result of a strike, then they are not liable. If they were guilty of any negligence contributing to its destruction, they are liable.

In my opinion there is no act or circumstance indicating any negligence on the part of the defendants prior to the stopping of train No. 3 about 5:30 on the evening of March 25. At that time the milk and cream which is involved in this suit was in transit on Train No. 1, having been delivered to the connecting carrier at Memphis at 5:00 o'clock p. m.

Defendants insist that the stopping of train No. 3 on the evening of March 25 and the destroying of the tank car of milk was not of itself sufficient to indicate to them it was likely that other trains would be stopped and the milk destroyed, and that therefore, there was no reason to re-route the milk or take any other precautions. The defendants insist that the milk was just as likely to be destroyed over any other route as over the one to which it was assigned. There is, however, no evidence that trains were stopped on any other route. However, the strike apparently was general, at least as far as Amite, which is 68 miles from New Orleans. Unquestionably automobile trucks conveying milk were being stopped and the milk dumped throughout the whole area.

On the evening of March 25 about 300 persons gathered at the town of Amite and stopped train No. 3 which was carrying a tank car loaded with milk. The strikers required the train crew to set the car out on the siding, and proceeded to open the valves and drain the milk out onto the ground. Some time thereafter, and before midnight, a number of holes were shot in the tank car.

This information was known to the station agent or telegraph operator who had

come on duty at 4:00 o'clock P.M. and remained on duty until 12:00 o'clock midnight. Immediately following the act of the mob in requiring the car to be set out, the agent notified division superintendent Casey at McComb, and at 5:37 that evening Casey sent the following telegram from McComb to:

"Mo· Rd
  McComb    March 25    1947
All Concerned.
                    Chicago Ill
537 P March 25 Amite La No 3 Eng 2426 15 Cars Condr Crisler Engr Cotten Was Meet By Approximately 300 People 6 Or Seven Unidentified Men Boarded Engine And Informed Engr No 3 Was Not To Leave Amite Until All Milk In Their Train Was Set Out Or Removed Same Demands Made To Condr. BCRX 702 Loaded With 3950 Gallons Milk Shipped By Brookhaven Creamery Co Wesson Miss Consigned To Cloverland Dairy Products Company New Orleans Was Set Out, After Car Set Out Unknown Persons Opened Car And Drain Valves Were Opened Allowing Milk To Drain From Car. Approximately 12 to 15 Unidentified Men Boarded Baggage Car And Removed 40-10 Gallon Cans Of Milk Shipped By Brookhaven Creamery Company Brookhaven Miss Consigned To Cloverland Dairy Products Company New Orleans This Milk Hauled Away In Trucks. IC 5754 Overseas Mail In Train For New Orleans Seal Was Broken On Side Of Car, Unidentified Party Requested Operator On Duty Amite For Seal To Reseal Car This Car Arrived New Orleans Bearing Seals RMG 629570 and IC 985267. N.R.C. 240 Loaded Chicago Illinois March 24th With 250-10 Gallon Cans Milk Shipped By Broden Co Consigned To Southern Dairy Producrs Company New Orleans Arrived New Orleans With One Seal Missing Contents Of This Car Not Disturbed.    No 3 Delayed 29 Mins. Milk Shippers In This Area Are On Strike.    Joint Lynch Chumley And Willingham On Line

                    Casey"

A Miss Miller, 21 years of age at the time, was the "third trick" operator working from 12:00 o'clock midnight until 8:00 o'clock in the morning. In her deposition she says that the operator whom she relieved at midnight did not tell her that train No. 3 had been stopped and the milk spilled, and that she had no knowledge of the fact. She did know however, in a general way, that a milk strike was on. She also says that she saw the car on the siding and the milk spilled on the ground, but apparently she attached little importance to it. She also observed the crowd gathering at 5:00 o'clock in the morning, and by 6:00 o'clock she says approximately 200 people were present. Because she was working alone, and wanted to know where she could report any trouble, she had communicated with the sheriff earlier in the night, just as she says she did every night. The sheriff told her he would not be available and there was no use to call.

The agent on duty at the time the first train was stopped, also notified the sheriff and the marshal. One cannot escape the conclusion that the law enforcement officers deliberately absented themselves, well realizing that their absence would undoubtedly be more healthful. Apparently they either felt that they were unable to cope with the situation, or they had no desire to do so, and therefore made no effort to do so.

All of these facts were known, or should have been known to the agents of the railroad company. While the conductor who was in charge of train No. 1 had no official information about the mob spirit prevailing at Amite, or the stopping of train No. 3 on the evening before, he did learn of it through discussions with other persons at the time he took over train No. 1 at 5:00 o'clock in the morning at McComb.

Two special agents of the connecting carrier were aboard the train at Amite, but did not leave the security of their positions in one of the cars of the train during the trouble.

Plaintiff takes the position that no violence was shown by the mob or threats made and that the train officials were negligent in not defending its property. With this contention, I cannot agree. Though orderly, the several hundred men apparently were determined in their attitude, and

resistance on the part of the train crew would have been futile and likely would have resulted in serious trouble.

The baggage man in another car which was also carrying milk which had been picked up farther along the way, observed several persons armed with revolvers as they boarded his car to pour the milk out of the cans in which it was contained.

I think the defendants had three alternatives—either to re-route the car—to have it cut out of the train, as they did other cars at McComb (there is no indication that these cars which were cut out contained milk)—or to have notified the plaintiff and received such instructions as it had to give.

On the contrary, the shipment was transported into Amite where, in view of the happenings during the previous twelve hours, it was likely to be destroyed. In this case the defendants were negligent. It was this negligence which contributed to cause the destruction of the shipment, and the plaintiff is entitled to recover.